FILED
JUL 23 2025
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:25-cr-00225-RWS-NCC |
| | ) | |
| TERRY SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION FOR PRETRIAL DETENTION AND HEARING**

Comes now the United States of America, by and through its Attorneys, Matthew T. Drake, Acting United States Attorney for the Eastern District of Missouri, and Torrie J. Schneider, Assistant United States Attorneys for said District, and moves the Court to order Defendant detained pending trial, and further requests that a detention hearing be held three days from the date of Defendant's initial appearance before the United States Magistrate under Title 18, United States Code, § 3141, et seq.

As and for its grounds for detention, the government requests this Court consider the following factors under Title 18, United States Code, Section 3142.

**Grounds for Detention**

1. Defendant is charged with Conspiracy to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 846, which carries a maximum penalty of life imprisonment.

## Presumption in Favor of Detention

2. Accordingly, a rebuttable presumption arises under Title 18, United States Code, Section 3142(e)(3) that there are no conditions or combination of conditions that will reasonably assure Defendant's appearance as required, and the safety of the community.

## Nature and Circumstances of the Offense

3. Title 18, United States Code, Section 3142(g)(1) requires this Court to consider the nature and circumstances of the offense charged, including whether the offense involves a crime of violence or a firearm. The offense Defendant is charged with involves controlled substances; therefore, they it is serious.

4. According to the Drug Enforcement Administration, the Jefferson County Municipal Enforcement Group (JCMEG) acquired CS1, who provided information regarding **Christopher TAYLOR**'s cocaine distribution. Through controlled buys, agents identified **TAYLOR**'s source of supply as **Stanford TIMES**, who was identified as working with **Vincent WOODS** to distribute drugs.

5. On January 21, 2025, agents obtained Title-III wiretap authorization for **WOODS**'s phone. On January 24, 2025, **WOODS** received a call from **SMITH**, indicating that **SMITH** was leaving right now and **WOODS** confirmed that he "got for my daddy and one for you, right?" **SMITH** agreed. Agents believe that **WOODS** had left drugs for **SMITH**, which he had just picked up.

6. On January 27, 2025, **SMITH** called **WOODS**, who was "on the block," and **SMITH** asked for "one loaned real quick." **WOODS** agreed.

7. On January 28, 2025, agents intercepted a call from an unknown male, whom **WOODS** appeared to be supplying with drugs, but **WOODS** needed to get the drugs from the stash house on Theodosia. **WOODS** eventually provided the male with the address: 5353 Theodosia Avenue.

8. On January 29, 2025, **WOODS** received text messages from CashApp that **SMITH** had sent him $75 and "**Stan**" sent him $300."

9. While intercepting calls on **WOODS**'s phone, agents heard conversations about "brothers" and "girls," that led them to believe that **WOODS** may also be dealing fentanyl. "Girl" is a common slang for cocaine and "bro" or "brother" is common for fentanyl. For instance, on February 4, 2025, **WOODS** called **SMITH** and **SMITH** asked, "what he doing?" **WOODS** responded that "he want one, uh brick." **SMITH** asked if he wanted the whole one and **WOODS** said: "All the way there but he want to split it up though. He want it uh, a he's ready and a he's not ready." **WOODS** also stated: "You got to make the he's not ready though," which **SMITH** confirmed. Agents believe this is coded language about fentanyl due to the use of the phrase "he's." Agents believe **WOODS** instructed **SMITH** to repackage the fentanyl into smaller quantities for distribution. Later that day, **SMITH** called **WOODS** and asked to meet so **SMITH** could "give that change."

10. On February 5, 2025, **WOODS** received a call asking for a "seven piece." **WOODS** told the person to "call **Terry** [**SMITH**] real quick . . . my phone about to go dead." The caller asked why **WOODS** was "always sending me off to the worker?", implying **SMITH** distributed drugs for **WOODS**.

11. On February 7, 2025, agents put pole cameras up at 5353 Theodosia and at **WOODS**'s residence. On February 10, 2025, **WOODS** received a call from an unknown male, advising **WOODS** of the pole camera on Theodosia. Due to illegal dumping, the city had previously put cameras in alleys, so the male advised **WOODS** that he did not know whose camera it was. **WOODS** then realized he also had a camera in his alley. The unknown male believed the camera was for illegal dumping and told **WOODS** not to "trip off of it."

12. Later that day, **SMITH** called **WOODS** and **WOODS** told him, "he's here." **SMITH** asked if **WOODS** was "gonna go to the lab," which agents believe referred to 5353 Theodosia. **WOODS** advised **SMITH** to "be careful, 'cause there's a situation in the alley."

13. On February 17, 2025, **WOODS** called **S. TIMES** asking if **BERRY** had been there. **WOODS** asked **S. TIMES**: "wanna get in the pot and all that," and "the pot. The money." **S. TIMES** confirmed. **WOODS** asked if **S. TIMES** had given **BERRY** "fifteen," which **S. TIMES** confirmed. **WOODS** said that **BERRY** was still telling them "any day now," which agents believe referred to a shipment of drugs. **S. TIMES** said he was "on the block" with "**T**."

14. Between February 19 and February 24, 2025, agents intercepted calls between **WOODS** and others in which **WOODS** told them that he was still waiting and would soon get it. On February 24, 2025, **BERRY** called **WOODS** to see if he was home. **BERRY** said "alright, I'm coming down the street." Agents observed **BERRY** pull into the alley behind **WOODS**'s residence. **WOODS** exited his house

empty-handed and approached **BERRY**'s vehicle, which was out of camera view. One minute after arriving, **BERRY** left and **WOODS** placed a large, black, weighted duffel bag in the passenger seat of his vehicle before going back inside.

15. Shortly after receiving the delivery from **BERRY**, **WOODS** exited the residence and left in his vehicle. Agents determined that he was going to 5353 Theodosia, so they responded there and observed **S. TIMES** and **WOODS** arrive and enter the house together. **WOODS** then began placing calls, including to **SMITH**, to whom he said: "Well shit, it's time to go to work!" **SMITH** responded: "Thank God, Jesus fucking Christ!" **SMITH** also responded to 5353 Theodosia. A short time later, an unknown male arrived and stopped his vehicle in the middle of street. **SMITH** handed him a package, which he placed in his trunk and left.

**The Weight of the Evidence**

16. Title 18, United States Code, Section 3142(g)(2) requires this Court to consider the weight of the evidence against Defendant, which is strong. Agents intercepted Defendant's calls, which coupled with physical and electronic surveillance demonstrate his participation in this conspiracy.

**The History and Characteristics of Defendant**

17. Title 18, United States Code, Section 3142(g)(3) requires this Court to consider the history and characteristics of the person, including the person's character, physical and mental condition, employment, financial resources, length of residence in the community and community ties, past conduct, history of drug or alcohol abuse, criminal history, and history related to appearing for court hearings.

18. While Defendant may have resided in this community for the majority of his life, the other factors the Court is required to consider weigh in favor of detention, specifically Defendant's past conduct and criminal history.

19. Although Defendant's criminal history is not recent, it is concerning. In 1997, he was convicted of robbery, first degree, for which he received a 10-year suspended sentence. The next year, he was federally indicted for distribution of controlled substances and was sentenced to 60 months' imprisonment. His supervised release was revoked twice.

20. Therefore, Defendant's criminal history and his past conduct demonstrates that he is both a danger to the community and a flight risk and weighs in favor of detention.

**The Nature and Seriousness of the Danger to the Community**

21. Defendant poses a significant danger to the community. As previously noted, Defendant has a criminal history involving the sale of drugs and robbery. Further, the nature and circumstances of the offense demonstrate that Defendant was dealing in large quantities of controlled substances, which is inherently dangerous. Thus, the safety of the community would clearly be at risk if the Court released Defendant on bond. *See* 18 U.S.C. § 3142(g)(4).

**Risk of Flight**

22. Defendant faces a lengthy term of imprisonment—likely the longest he has ever faced; therefore, his risk of flight is significant.

## **Conclusion**

23. The government submits that after considering all the factors in Title 18, United States Code, Section 3142(g), including the presumption in favor of detention, the Court will find that they weigh in favor of detention. There is clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any person and the community and there is a preponderance of evidence that no condition or combination of conditions will reasonably assure Defendant's appearance in court.

Respectfully submitted,

MATTHEW T. DRAKE
Acting United States Attorney

*/s/ Torrie J. Schneider*
TORRIE J. SCHNEIDER
Assistant United States Attorney